UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| [UNDER SEAL], | ) | Case No. |
| | ) | |
| Plaintiffs, | ) | COMPLAINT |
| | ) | |
| vs. | ) | |
| | ) | |
| [UNDER SEAL], | ) | **FILED IN CAMERA AND UNDER SEAL** |
| | ) | **PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | ) | |
| _____ | ) | |

**DOCUMENT TO BE KEPT UNDER SEAL**

CROSS & BENNETT LLC
KEITH CROSS (CO State Bar No. 8934)
KCross@CrossBennett.com
108 E. St. Vrain, Suite #20
Colorado Springs, CO  80903
Tel.:  (719) 633-1359
Fax:  (719) 633-5788

PHILLIPS & COHEN LLP
ERIC R. HAVIAN (CA State Bar No. 102295)
erh@pcsf.com
CLAIRE M. SYLVIA (CA State Bar No. 138990)
cms@pcsf.com
JESSICA T. MOORE (CA State Bar No. 183431)
jtm@pcsf.com
131 Steuart Street, Suite 501
San Francisco, California  94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for [under seal]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MICHIGAN, NEVADA, NEW YORK, OKLAHOMA, TENNESSEE, TEXAS, VIRGINIA, and WISCONSIN, ex rel. DAVID BARBETTA, | ) ) ) ) ) ) ) ) ) | Case No. COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 et seq.]; CALIFORNIA FALSE CLAIMS ACT [Cal. Govt. Code §12650 et seq.]; FLORIDA FALSE CLAIMS ACT [Fla. Stat. Ann. §68.081 et seq.]; GEORGIA FALSE |
| Plaintiffs, | ) ) ) | MEDICAID CLAIMS ACT [Ga. Code Ann. §49-4-168 et seq.]; ILLINOIS WHISTLEBLOWER REWARD AND |
| vs. | ) ) | PROTECTION ACT [740 Ill. Comp. Stat. §175 et seq.]; INDIANA FALSE CLAIMS AND |
| DEFENDANTS DAVITA, INC. and TOTAL RENAL CARE, INC., | ) ) ) | WHISTLEBLOWER PROTECTION ACT [Ind. Code Ann. §5-11-5.5-1 et seq.]; LOUISIANA |
| Defendants. | ) ) ) ) ) ) ) | MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW [La. Rev. Stat. §437 et seq.]; MICHIGAN MEDICAID FALSE CLAIMS ACT [Mich. Comp. Laws. §400.601 et seq.]; NEVADA FALSE CLAIMS ACT [Nev. Rev. Stat. Ann. §357.010 et seq.]; NEW YORK |

FALSE CLAIMS ACT [N.Y. State Fin. §187 et seq.]; OKLAHOMA MEDICAID FALSE
CLAIMS ACT [Okla. Stat. tit. 63 §5053 et seq.]; TENNESSEE FALSE CLAIMS ACT AND
TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code Ann. §4-18-101 et seq. and
§71-5-181 et seq.] TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code
Ann. §36.001 et seq.]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [Va. Code Ann
§8.01-216.1 et seq.]; and WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT
[Wis. Stat §20.931 et seq.]

**JURY TRIAL DEMANDED**

**(FILED IN CAMERA AND UNDER SEAL)**

Plaintiff-Relator David Barbetta ("Relator"), through his attorneys Phillips & Cohen LLP

and Cross & Bennett LLC, on behalf of the United States of America, the States of California,

Florida, Georgia, Illinois, Indiana, Louisiana, Michigan, Nevada, New York, Oklahoma,

Tennessee, Texas, Wisconsin, and the Commonwealth of Virginia (collectively "the Plaintiff

States"), for his Complaint against defendants DaVita, Inc. and Total Renal Care, Inc.

2

(collectively "DaVita" or "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.      INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and the Plaintiff States arising from false and/or fraudulent statements, records, and claims made and caused to be made by defendants and/or their agents, employees and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§3729 et seq. (the "Act" or "FCA"), and the false claims acts of the Plaintiff States.

2.      DaVita has engaged in a nationwide scheme to illegally induce physicians to refer, recommend and otherwise influence their patients to go to DaVita-owned dialysis centers to receive treatment for End Stage Renal Disease.

3.      DaVita owns dialysis centers across the country, both by itself and in joint ventures with physician groups.  DaVita induces physicians to refer business to its facilities, and rewards monetarily those that provide such referrals by: (a) selling them shares in existing DaVita dialysis centers for below-market rates; (b) buying shares in dialysis centers owned by physicians for above-market rates; (c) giving physicians kickbacks masked as profits from joint ventures; and (d) paying physicians to refrain from building competing dialysis centers.

4.      DaVita has violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7b(b), by providing these inducements to physicians.  The AKS is designed to ensure that physicians make clinical decisions based upon informed, impartial medical judgment – judgment unaffected by personal financial motives.  DaVita has knowingly and routinely violated that fundamental principle – corrupting the medical judgment of physicians across the country by giving them what one DaVita manager described as "a bag of money" to obtain

referrals of the physicians' patients.

5.      Any claims submitted either by DaVita or the physicians for services tainted by these illegal kickbacks are ineligible for reimbursement by the Medicare Program, Medicaid Program, or other federal or state-funded health care programs.  Defendants have submitted, or caused others to submit, such kickback-tainted claims.  As a consequence, the United States and the Plaintiff States have been damaged in significant amount.

6.      Defendants' conduct alleged herein violates the federal False Claims Act and False Claims Acts of the Plaintiff States.  The federal False Claims Act was originally enacted during the Civil War.  Congress substantially amended the Act in 1986 – and, again, in May 2009 – to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

7.      The FCA prohibits: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) conspiring to violate any of these provisions.  31 U.S.C. §§3729(a)(1)(A)-(C).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United

States.  31 U.S.C. §3729(a)(1).

8.      The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

9.      As set forth below, Defendants' actions alleged in this Complaint also violate the California False Claims Act, Cal. Govt. Code §12650 et seq.; the Florida False Claims Act, Fla. Stat. Ann. §68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168 et seq.; the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §175/1-8; the Indiana False Claims and Whistleblower Protection Act, Ind. Code §5-11-5.5 et seq.; the Louisiana Medical Assistance Program Integrity Law, La. Rev. Stat. §46:437.1 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws. §400.601 et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §357.010 et seq.; the New York False Claims Act, N.Y. State Fin. §187 et seq.; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §5053 et seq.; the Tennessee False Claims Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §4-18-101 et seq. and §71-5-181 et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.001 et seq.; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 et seq.; and the Wisconsin False Claims for Medical Assistance Act, Wis. Stat §20.931 et seq.

10.     Based on these provisions, qui tam plaintiff and relator David Barbetta seeks to recover all available damages, civil penalties, and other relief for federal and state-law violations alleged herein.

## II.      PARTIES

11.      Plaintiff/Relator David Barbetta is a citizen of California.  Mr. Barbetta is a CFA Charterholder.  He worked for DaVita from April 2007 until July 2009 as a Senior Financial Analyst in the Mergers and Acquisitions department, known within DaVita as "Deal Depot." DaVita's Deal Depot is responsible for buying and selling shares in dialysis centers and dialysis-related joint ventures.  Mr. Barbetta's responsibilities included using the economic models developed by DaVita for determining values of dialysis centers and joint ventures.  Mr. Barbetta currently works as a Software Engineer Consultant at Barclay's Global Investors in San Francisco, California.

12.      Defendant DaVita, Inc. is a Delaware corporation with its corporate headquarters located at 1627 Cole Blvd., Lakewood, CO 80401.  Prior to 2009, DaVita's home offices were located at 601 Hawaii Street, El Segundo, California 90245.

13.      According to its most recent annual report, DaVita is a leading provider of dialysis services in the United States for patients suffering from chronic kidney failure, also known as end stage renal disease, or ESRD.  As of December 31, 2008, DaVita operated or provided administrative services to 1,449 outpatient dialysis centers located in 43 states and the District of Columbia, serving approximately 112,000 patients.  DaVita also provides acute inpatient dialysis services in approximately 700 hospitals and related laboratory services.  Its dialysis and related lab services business accounts for approximately 96% of its consolidated revenues.  Ex. 1 at 2, incorporated herein.  Hereinafter, all Exhibits referenced in this Complaint are incorporated herein.

14.      Total Renal Care, Inc. ("TRC") is a California corporation and a wholly-owned subsidiary of DaVita, Inc.  DaVita uses TRC and other subsidiaries to buy, sell and hold interests

in various dialysis centers and dialysis-related joint ventures.

## III.   JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the last of which specifically confers

jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.  In

addition, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the State-law

claims.

16.     Under 31 U.S.C. §3730(e), and under the comparable provisions of the Plaintiff

State statutes, there has been no statutorily relevant public disclosure of the "allegations or

transactions" in this Complaint.  Relator, moreover, would qualify under those sections as an

"original source" of the information in this Complaint even had such a public disclosure

occurred.

17.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C.

§3732(a), which authorizes nationwide service of process and because the Defendants have

minimum contacts with the United States, and can be found in and/or transact business in this

District.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and 1395(a) and

31 U.S.C. §3732(a) because Defendants can be found in and/or transact business in this District.

At all times relevant to this Complaint, Defendants regularly conducted substantial business

within this District, maintained employees in this District, and/or made significant sales within

this District.  Defendant maintains its corporate headquarters in this District.  In addition,

statutory violations, as alleged herein, occurred in this District.

IV.     **FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS**

    A.     **Medicare**

19.     Medicare is a federally-funded health insurance program primarily benefitting the elderly.  Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted.

20.     The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider.  Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

21.     Medicare provides benefits for patients with End Stage Renal Disease under Parts A and B.  Individuals otherwise ineligible for Medicare, become eligible when they develop ESRD.

22.     Medicare pays providers only for services that it considers "reasonable and necessary for the diagnosis or treatment of illness or injury."  Social Security Act §1862(a)(1)(A).  Providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary."  42 U.S.C. §1320c-5(a).

23.     The Medicare program is administered through the Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS").

**B.     Medicaid**

24.     Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the federal Government and those states participating in the program.  Thus, under Title XIX of the Social Security Act, 42 U.S.C. §1396 <u>et</u> <u>seq.</u>, federal money is distributed to the states, which in turn provide certain medical services to the poor.

25.     Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary").  After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan.  42 U.S.C. §1396b(a)(1).

26.     Individuals may be "dual eligible" for both the Medicare program (as the primary insurer) and the Medicaid program (as the secondary insurer).

**C.     Other Federal and State-Funded Health Care Programs**

27.     The federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

28.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

29.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.

30.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

31.     The Plaintiff States provide health care benefits to certain individuals, based either on the person's financial need, employment status or other factors.  To the extent those programs are covered by that State's False Claims Act, those programs are referred to in this Complaint as "state-funded health care programs."

## V.     APPLICABLE LAW

### A.     The Federal Anti-Kickback Statute Prohibits Dialysis Centers From Offering Financial Incentives To Induce Physicians To Refer Their Patients to the Center

32.     The federal health care Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

33.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. §1320a-7b(b).

34.     The AKS defines impermissible "payments" broadly as: "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b)(1).  In addition to the more obvious types of remuneration (e.g.,

cash payments, gifts of cars, free vacations, etc.), the statute also prohibits less direct forms of payment such as providing items or services (such as an opportunity to buy into a joint venture) at less than market value, or investment arrangements where the referring provider has a substantial financial interest in referring his or her patients to the joint venture.

35.     The Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") is responsible for issuing regulations and guidance interpreting the AKS.  In this capacity, HHS OIG has expressed particular concern that at least three types of transactions at issue in this case have a strong likelihood of violating the AKS and thus should be subject to heightened scrutiny: (a) compensation to referring physicians embedded in excessive payments for the purchase of the physicians' practice by an entity who is in a position to receive ongoing referrals from the physician; (b) compensation in the form of payments for non-competition agreements; and (c) joint ventures and other investment arrangements where a referring-physician owns part of an entity to which he or she refers patients.

### 1.     Excessive Payments for Physician Practices and Other Physician Assets

36.     HHS OIG has specifically expressed concern about the purchase of a physician practice or other similar entity in a position to make referrals by an entity that receives referrals from that practice.  In a December 22, 1992 Opinion Letter, the HHS Office of the Inspector General ("OIG") cautioned that the purchase of a physician practice by a hospital

> "as a means to retain existing referrals or to attract new referrals . . . implicate[s] the anti-kickback statute because the remuneration paid for the practice can constitute illegal remuneration to induce the referral of business reimbursed by the Medicare or Medicaid programs."  Ex. 2 (12/22/1992 HHS OIG Opinion Letter).

37.     The letter further advised that, in order to determine whether the price paid for a physician practice constituted an illegal kickback:

"it is necessary to scrutinize the payments (including the surrounding facts and circumstances) to determine the purpose for which they have been made.  As part of this undertaking, it is necessary to consider the amounts paid for the practice . . . to determine whether they reasonably reflect the <u>fair market value</u> of the practice . . . , in order to determine whether such items in reality constitute remuneration for referrals."

(emphasis in original).

38.     Moreover, the letter cautioned:

"When considering the question of fair market value, we would note that the traditional or common methods of economic valuation do not comport with the prescriptions of the anti-kickback statute.  Items ordinarily considered in determining the fair market value may be expressly barred by the anti-kickback statute's prohibition against payment for referrals. . . .  Accordingly, when attempting to assess the fair market value . . . attributable to a physician's practice, it may be necessary to <u>exclude from consideration any amounts which reflect, facilitate or otherwise relate to the continuing treatment of the former practice's patients</u>. . . . Thus, any amount paid in excess of the fair market value of the hard assets of the physician practice would be open to question. . . .

Ex. 2 (emphasis added).

39.     Accordingly, HHS OIG has cautioned that valuing a physician practice or other physician investment using a formula based on the practice's revenue stream raises concerns

under the AKS.  Cash-flow based valuation is not per se a violation of the AKS, but it presents a significant concern because such a valuation would potentially lead to a payment based on the value of Medicare, Medicaid or other federal program referrals the selling physician made to the practice and/or might make to the practice in the future.  Cf. Ex. 3 (HHS OIG Advisory Opinion 09-09, at 7 n.5 (July 29, 2009)) ("a cash flow-based valuation of that business potentially would include the value of the [physicians'] referrals over the time that their [practice] was in existence prior to the [sale]")).  Accordingly, it is appropriate to apply heightened scrutiny to such transactions.

### 2.      Non-Competition Agreements

40.      The December 22, 1992 HHS OIG Opinion also cautioned that "payment for covenants not to compete" where there is a continuing relationship of referrals would raise the question of compliance with the AKS.  In some cases, payments for non-competition agreements unlawfully compensate a physician for steering patients for federally funded medical care or services.  Ex. 2.

### 3.      Joint Ventures and Other Physician Investments

41.      The HHS OIG has issued regulations defining certain "safe harbors" to describe types of financial relationships that would otherwise prohibited by the AKS, but do not present sufficient concern that they should ordinarily be subject to the law.  The burden is on the party seeking to benefit from the safe harbor to demonstrate that the transaction falls within the protection of the safe harbor.

42.      One such safe harbor covers certain situations in which a physician is an investor in a dialysis center or other business to which that physician makes referrals or otherwise recommends to patients.  See 42 C.F.R. § 1001.952.  Ordinarily, any money a physician received

as a result of his or her investment in the dialysis center – such as regular distribution of profits – could constitute illegal remuneration under the AKS.

43.     This "safe harbor" is narrowly tailored to prevent improper economic inducements from being disguised as unproblematic investment mechanisms.  As HHS OIG explained: "With respect to joint ventures, the major concern is that the profit distributions to investors in the joint venture, who are also referral sources to the joint venture, may potentially represent remuneration for those referrals."  Ex. 4 (HHS OIG Advisory Opinion 97-5, at 7 (October 6, 1997)).

44.     An entity whose activity otherwise would be covered by the broad, remedial language of the AKS is exempted from liability through the "safe harbor" only if that entity's investment interests and conduct meet all of the applicable standards set forth in the regulations. 42 C.F.R. § 1001.952(a).  Four of those requirements particularly relevant in the present case include that:

> (a)     "No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity;" and
>
> (b)     "The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity;" and

(c)      "No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12-month period may come from referrals or business otherwise generated from investors;" and

(d)      "The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor."

See 42 CFR § 1001.952(a)(2)(i), (iii), (vi) (viii).  ).  As will be discussed below, DaVita's transactions with physicians do not fall within this safe harbor.

> **B.      Compliance With the Federal Anti-Kickback Statute Is a Prerequisite to a Provider's Right To Receive or Retain Reimbursement from Federal and State-Funded Health Care Programs.**

45.      Compliance with the Anti-Kickback law is a precondition to participation as a health care provider in federal and state-funded health care programs.  With regard to Medicare and Medicaid, for example, each provider that participates in the programs must sign a provider agreement with his or her state.  Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicare and Medicaid providers to agree that they will comply with all legal requirements, which include the anti-kickback provisions of the law.  In a number of states, the Medicare and Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicare or Medicaid program, including compliance with federal laws.  Ex. 5 (examples of form certifications for Medicare, Medicaid, and other federal health programs).

46.     In sum, either pursuant to provider agreements, claims forms, or in another manner, providers who participate in a federal or state-funded health care program must certify that they have complied with the applicable federal rules and regulations, including the AKS.

47.     Any party convicted under the AKS <u>must</u> be excluded from federal health care programs (<u>i.e.</u>, not allowed to bill for services rendered) for a term of at least five years.  42 U.S.C. §1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must also direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. §1320a-7(b).

48.     Thus, compliance with the Anti-Kickback statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs.  Similarly, compliance with the federal anti-kickback statute and comparable state anti-kickback statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from state-funded health care programs.

## VI.    BACKGROUND

49.     Chronic kidney disease is a progressive disease, which ultimately destroys the kidney's ability to process and clean blood.  The loss of kidney function is normally irreversible.  End Stage Renal Disease ("ESRD") is the stage of advanced kidney impairment that requires continued dialysis treatments or a kidney transplant to sustain life.  Dialysis is the removal of toxins, fluids and salt from the blood of ESRD patients by artificial means.

50.     Patients suffering from ESRD generally require dialysis at least three times per week for the rest of their lives.  There are more than 345,000 ESRD dialysis patients in the United States.

51.     Since 1972, the federal government has provided universal payment coverage for dialysis treatments under the Medicare ESRD program regardless of age or financial circumstances.  Under this system, Congress establishes Medicare rates for dialysis treatments, related supplies, lab tests and medications.  Other Government-funded health care programs and private insurance plans also routinely provide coverage for dialysis, either separately or in combination with a patient's Medicare coverage.

52.     As of December 31, 2008, DaVita owns, operates and/or provides administrative services to 1,449 outpatient dialysis centers located in 43 states and the District of Columbia, serving approximately 112,000 patients.  Ex. 1 at 2.

53.     Approximately 87% of DaVita's total patients are covered by Government-funded health care programs.  Id.

## VII.   ALLEGATIONS

54.     DaVita's business model is fundamentally dependent on its relationship with physicians who refer patients to its dialysis centers – especially its relationships with the few key physicians who are responsible for a major share of all patients who are treated at the centers. DaVita explained this dynamic succinctly in its 2008 annual report filed with the Securities and Exchange Commission as follows:

"As is typical in the dialysis industry, one or a few physicians, including the

center's medical director, usually account for all or a significant portion of a

dialysis center's patient referral base.  Our medical directors provide a substantial

portion of our patient referrals.  If a significant number of physicians were to

cease referring patients to our dialysis centers, our business could be adversely

affected." Ex. 1 at 9.

55.     Rather than working to generate business by simply demonstrating superior

quality of clinical services and patient care, DaVita intentionally uses illegal kickbacks to

physicians to secure a steady flow of referrals.  DaVita routinely enters into joint ventures with

these physicians, selling them shares of existing dialysis centers below fair-market value, and/or

buying shares of dialysis centers above fair-market value from them.  One DaVita manager

explained to Relator that Deal Depot used these deals to funnel "a bag of money" to the

physicians.  In fact, the only possible motivation for DaVita to sell a physician an ownership

interest in a center at below fair market value is to induce the physicians to commit to steer all or

nearly all of their patients to DaVita-owned dialysis centers.

      **A.**     **DaVita's "Buy High / Sell Low" Strategy**

56.     The AKS allows physicians to engage in certain business transactions with

entities to which they refer patients.  As discussed above, however, an essential limitation on

such relationships is that any payments made to the physicians must be at fair market value.  This

rule is designed to prevent dialysis centers (and other referral-receiving companies) from

disguising illegal kickbacks as inflated payments to physicians for other assets or services.

57.     The prices DaVita pays for dialysis centers it buys, and similarly its charges for

centers it sells, violate this restriction.  An elementary feature of the marketplace is that

participants try to sell their goods and services for as much as possible, and buy goods and

services as cheaply as possible (i.e., Buy Low / Sell High).  DaVita's approach to dialysis center

joint ventures turns this dynamic on its head.  DaVita deliberately pays more than fair market

value for dialysis centers and joint-venture shares it buys from physicians in a position to refer business to the centers, and regularly charges cut-rate, below market prices when it sells shares of dialysis centers to physicians.

58.   This "Buy High / Sell Low" strategy is the cover DaVita uses to mask the illegal kickbacks it gives these physicians to secure a steady flow of referrals from them.

59.   DaVita masks and supports its "Buy High / Sell Low" strategy primarily through manipulation of the financial models its analysts and its outside appraisers use to calculate the value of dialysis centers.  DaVita personnel in its "Deal Depot" Mergers and Acquisitions department, under direct orders from the Vice Presidents and other managers in charge of the department, manipulate the valuation process with both ad hoc adjustments to various financial models, and through the application of non-standard – even illogical – (from an accounting point of view) formulas and algorithms.

60.   Some of the non-standard algorithms DaVita uses to "game" its projections tend to decrease the projected value of a dialysis center.  Others generally have the opposite effect, increasing the projected value of a center.  When DaVita sells centers to physicians, it uses the algorithms that decrease the value of the centers, thus decreasing the purchase price to the physicians.  Conversely, when it buys centers from physicians, DaVita tends to use only the algorithms that increase the values of centers, thus increasing the price paid to the physicians. The manipulative application of these algorithms, as standard practice, leads to the occasional over-valuing of the centers DaVita buys, and the systematic undervaluing of the centers it sells.

61.   The primary mechanism DaVita uses to depress the value of centers DaVita sells is the application of a financial algorithm known as HIPPER compression.  In addition to this structural machination, DaVita routinely manipulates its financial models by using artificial and

unreasonable values for expected costs or other key financial indicators.

62.     EBITDA is an accounting convention representing "Earnings Before Interest, Taxes, Depreciation and Amortization."  EBITDA is a primary metric used by DaVita to value centers.  EBITDA represents a measure of a center's earnings, and one way DaVita gauges the value of centers is based on a multiple of annual EBITDA.  The higher the multiple, the more the buyer is paying for a particular stream of profits.

63.     As a result of DaVita's routine fraudulent manipulations, since 2006 DaVita has paid, on average, more than seven times (7x) a center's expected future annual EBITDA for dialysis centers it has purchased from physicians.  Exs. 6 (Closed Deal Activity Spreadsheet // "2006 Closed Deals," "2007 Closed Deals," "2008 Closed Deals," "2009 Closed Deals" worksheets ) & 7 (DaVita M&A Transaction v8 spreadsheet).  At the same time, however, Relator is aware from his experience and from discussions at DaVita that it charged less than three times (3x) a center's annual historical EBITDA when selling a dialysis center to physicians.

64.     Because of DaVita's manipulation, in at least one of the transactions where DaVita purchased a center, the price paid was so high that DaVita's expected rate of return on capital was less than its cost of capital.  Conversely, the valuation DaVita assigned to centers it simultaneously sold shares in to the same physician group was less than 1/20th the per-center valuation of the centers it purchased, even though the centers it sold shares in had higher profits. Ex. 8 (Rocky Mountain 2008-04-21c 39.497M" // Summary worksheet) & Ex. 9 (Denver Transaction Summary).  These manipulations resulted in money paid (and assets transferred) to referral sources in excess of any amount justified as fair market value.  These overpayments were made for the specific purpose of inducing those referral sources to send their patients to DaVita

dialysis centers for medical services, including government funded services.

65.     One way that DaVita hides these machinations is through the selective use of third-party valuations.  DaVita generally uses an outside firm, Duff & Phelps ("D&P"), to provide a "fair market value" opinion whenever DaVita sells ("divests" in DaVita's parlance) all or part of a dialysis center.  DaVita manipulates these opinions to ensure they support the proposed sale price by "gaming" the revenue and cost assumptions given to D&P.  Because D&P relies on these assumptions without independent confirmation, DaVita is able to ensure that these opinions say whatever DaVita wants them to say (i.e., they are not "independent" third-party valuations, but rather are valuations of projections which DaVita has manipulated).

66.     However, DaVita does not have a policy to get a "fair market value" opinion from D&P or any other firm when it buys all or part of a dialysis center.  In this way, DaVita hides from D&P the substantial difference in its revenue and cost projections when it is buying versus selling a dialysis center.

67.     DaVita's suspect financial arrangements with patient referral sources were often most egregious in cases of "hotspots."  Internally at DaVita, a "hotspot" is a competitive situation in which DaVita risked losing a prime relationship with a physician group to a DaVita competitor.

### 1.     **HIPPER Compression**

68.     HIPPER compression is an algorithm developed by DaVita and utilized as a policy from at least 2006.  It is based on the presumption that insurance companies that pay the most for dialysis treatments will, within three years, be able to negotiate lower reimbursement rates to more closely mirror average rates.  In DaVita's parlance, a HIPPER is a "High Paying Patient" (i.e. a patient with an insurance plan that reimburses at a high rate).

69.     The HIPPER compression algorithm assumes that no insurer will pay more than $750 per dialysis treatment, beginning in year 3 of a financial model.  Therefore, for patients whose insurance company would likely pay $1,200 per treatment, DaVita assumes that the insurance company will, in fact, lower its payment by over 40% per treatment from year 3 onward.

70.     The predictable and expected result of applying HIPPER compression to a financial analysis is that the dialysis center will be expected to have substantially lower future revenue, and thus will be less valuable.  HIPPER compression, however, is an overly conservative and unrealistic assumption, acknowledged even by DaVita's CFO, Richard Whitney, in a May 19, 2009 email.  In the email, Mr. Whitney (and other recipients) are asked about aspects of the acquisition revenue build up model, including specifically that it "compresses revenue to $750 all in for years 3 and beyond."  Mr. Whitney responds: "If all of our private pay compresses to 750 without increases in the lower rate biz or mcare [Medicare]. . .we are out of business.  In other words this is not a realistic assumption."  Ex. 10 (5/19/2009 email "RE: Acquisition Revenue Build Up Assumptions").

71.     As one of many examples, in the "Wauseon" partial divestiture in Ohio in November 2008, DaVita sold additional shares of a center to an existing joint-venture physician/referral source.  The application of HIPPER compression drove the value of the center down by more than 50%, from approximately $4.0M to $1.7M.  Ex. 11 (Wauseon Valuation Summary).  On the basis of this artificially low value, DaVita literally gave away to the referral source much of the value of the divested shares.

72.     Although DaVita's standard financial models provide that HIPPER compression should be used when valuing centers to be bought as well as those to be sold, in practice HIPPER

compression is not used when valuing centers to be bought.  DaVita understands that the

adjustment will produce valuations well below market and thus will not be accepted by any

rational seller.

73.     Sometimes DaVita simply did not use HIPPER compression, as in the following

acquisitions:  (a) the "Bakersfield" acquisition in California in October 2007, (b) the "SKI"

acquisition in Arizona in December 2007, (c) the "Decatur" acquisition in Georgia in April 2008,

(d) the "Coastal" acquisition in Florida in May 2008, (e) the "Kansas" acquisition in June 2008,

and (f) the "Caucus" acquisition in Iowa in December 2008.  Ex. 7 (DaVita M&A Transactions

v8 spreadsheet).

74.     In some acquisitions DaVita ostensibly used HIPPER compression, but negated

its effect by artificially increasing the revenue-per-treatment cap significantly.  For example, in

the "Payton" acquisition, in Ohio in September 2008, DaVita increased the HIPPER per

transaction cap from $750 to $950.  More recently, in the "Stemmer" and "Central Florida"

acquisitions in Florida in December 2008 and February 2009, respectively, the cap was increased

from $750 up to $2500.  Ex. 7 (DaVita M&A Transactions v8 spreadsheet).

75.     More often, when valuing acquisitions DaVita overrides the effect of HIPPER

compression through manual adjustments to revenue projections or patient volume projections,

as described below.

## 2.     Manipulating Individual Values Used in Financial Models

76.     Beyond the use of non-standard algorithms, DaVita also routinely games the

valuations produced by its financial models by arbitrarily manipulating the individual values that

are plugged into standard formulas.  Some typical examples of such manipulations include the

following:

77.     DaVita routinely manipulates the estimate of how much it will cost to provide each treatment.  For example, in most of its internal financial modeling and reporting, DaVita's accountants estimate that it costs the company $25-$35 in general and administrative ("G&A") expenses to provide each dialysis treatment.  However, when projecting the value of dialysis centers DaVita intends to purchase, the analysts in Deal Depot are instructed to use an estimate of $13.50 per treatment for G&A expenses.  In addition, they estimate that these expenses will remain constant from year to year regardless of inflation.  By artificially underestimating the dialysis center's costs, this manipulation unrealistically inflates the profit the center is expected to generate and increases the projected "value" of the center.

78.     The impact of this one manipulation is significant.  From 2007 to 2009, the difference between the price DaVita paid in 34 of its acquisition transactions was approximately $20 million (more than 10%) higher than the valuation would have justified if the value used for the expected expense per treatment were increased to just $18.00.  Ex. 7 (DaVita M&A Transactions v8 spreadsheet).  DaVita's finance team documented and recommended more accurate reflections of expense-per-treatment costs, but Deal Depot prevailed in its artificial manipulations without any apparent support or analysis.

79.     In a similar manner, DaVita routinely uses artificially low values for its expected bad debt (i.e., amounts due to DaVita that will be written off as uncollectable) to fraudulently increase the "value" it assigns to centers it plans to buy from physicians.

80.     On occasion, DaVita also manipulates other cost elements to achieve the same result.  For example, in the "Atlanta Dialysis" transaction in December 2006 and a transaction with Dr. Dahhan in California in December 2007, DaVita depressed the expected staffing costs

to manipulate the valuation.  Ex. 12 (Atlanta – Final Acquisition Model – 10.31.06.xls); Ex. 13 (Dahhan 120407 Version 2.xls // Consolidated P&L worksheet).

81.     On the revenue side of the transaction, DaVita uses multiple methods to inflate the valuation and hence the purchase price.  For some transactions, DaVita increased the expected revenue by inflating the projected number of high paying (HIPPER) patients the center was expected to treat.  This method, which effectively turns the usual HIPPER assumption on its head, is known colloquially within DaVita as using the "HIPPER bus" – i.e., assuming a mythic bus full of HIPPERs will routinely drop patients off at the center.  For example, in the "Fayetteville" transaction in Arkansas in February 2008 – a transaction involving centers treating 110 patients – the initial projected revenue was $243 per treatment.  DaVita increased this to $320 per treatment, by assuming the HIPPER bus would drop off 10 patients whose insurance policies each paid $1050 per treatment.  Ex. 14 (Fayetteville RKC Model Post DD ROD Review Final $3.79MM 080114.xls // Summary worksheet).

82.     DaVita also increased the expected revenue per transaction by artificially increasing the amount of epogen each patient was projected to receive.  Epogen is a drug given to patients during dialysis treatment.  A substantial portion of the revenue DaVita receives for each treatment is attributable to the profit it makes on epogen.  Id.

83.     In other situations, DaVita's method was far more direct – it simply increased the expected revenue per treatment.  For example, in a transaction in Kansas in June 2008, DaVita "gamed" the revenue by simply bumping the expected revenue per treatment up from $310 to $350.  Ex. 15 (Kansas – Post DD Model 06-05-08 $18.75M with Budgets.xls // Summary worksheet).

84.     Of late, DaVita has relied more on artificially increasing the "terminal value" of a

center to boost its projected value.  DaVita's financial models (as is standard) estimate projected revenue year-by-year for a certain number of years going forward, and then account for all expected revenue beyond that point through use of a lump-sum amount.  That lump sum is the "terminal value."  This terminal value is usually calculated as a certain multiple of the center's expected annual earnings.  A higher terminal value produces a higher overall projected value for the center.

85.     In recent years, DaVita has used progressively higher EBITDA multipliers, without justification, to produce higher terminal values and thus further arbitrarily inflate the projected value of centers it intends to buy.  In 2007 the average terminal value was 5.3 times expected revenue.  Ex. 7 (DaVita M&A Transactions v8 spreadsheet).  In 2008, the multiple increased to 5.8 and in 2009 it is close to 7.0.  Id.  On one currently active deal the multiple is 7.8.  Ex. 16 (KantTucker Model 2009-06-16.xls // Assumptions Summary worksheet).

86.     In order to artificially depress the value of centers DaVita sells to physicians, its managers and analysts reverse the ad hoc "gaming" method, artificially inflating the expected amounts to be paid for labor and other expenses and using HIPPER compression to artificially decrease the expected revenue.

87.     For example, on June 10, 2009, Relator was preparing the financial projections for a transaction involving the sale of seven DaVita-owned dialysis centers in the San Francisco East Bay.  This transaction had not yet been completed at the time Relator left DaVita.  The transaction was intended to address a "competitive hot spot," namely DaVita's concern that the physician group responsible for a substantial portion of the referrals to those facilities would decide to partner with a competing dialysis company, and send their patients to centers owned by that company.  To prevent that defection, DaVita decided to sell these physicians an ownership

stake in the East Bay facilities, thereby providing them with a financial incentive to continue referring their patients there.

88.     While Relator was preparing the financial projections that DaVita planned to give its third-party valuation firm (D&P), Division Vice President Misha Palecek approached him. Mr. Palecek told Relator that he had artificially inflated the operating cost projections for the centers because he wanted to "crush the projections to keep the valuation low." When Relator indicated discomfort with that brazen admission, Mr. Palecek warned him not to "give me any of that ethics crap."

89.     DaVita was concerned that East Bay Nephrology (EBN) would balk at the dismal revenue projections contained in D&P's valuation, which incorporated the HIPPER-compressed artifice. Although DaVita offered to sell the shares at slightly above the ostensible fair market value obtained from D&P, DaVita did not-share the D&P projections, instead directing the buyer (EBN) to use a financial advisor to create its own valuation numbers. EBN did so, ultimately using projections created by the financial advisor. Thus, DaVita possessed two sets of projections for the same centers: one using artificial HIPPER compression in the D&P valuation (concealed from the buyer), and another that was viewed by both parties and ostensibly relied upon by DaVita. In fact, DaVita needed the buyer's commissioned valuation because DaVita was afraid its own normally used and dismally low projections would scare the buyer off.

90.     As a result of HIPPER compression, and those ad hoc manipulations, the value assigned to the East Bay centers, for purposes of the sale to the referring physicians, was substantially lower than their fair market value. This "sell-low" transaction, if consummated, will result in free money to the physician in exchange for a guaranteed supply of referrals for DaVita.

91.     That the "gaming" of the financial models is standard practice at DaVita is illustrated by an email exchange among DaVita executives around the time Relator announced he was leaving the company.

92.     In a July 24, 2009 email to Relator (and copied to other members of the Deal Depot team), Bryan R. Parker, Vice President of Special Projects, wrote:

"Sorry to hear you are leaving us, but do wish you the best.

 "I was hopeful before you leave you, or you and Queenie, can give us a list of the most common things one could do within the model to make sure it passes the COC ["Cost of Capital"] and IRR ["Internal Rate of Return"] hurdles.  As we redesign the model I would like to be mindful of these."

93.     Chet Mehta, Vice President of Finance, responded: "Bryan - you mean 'gaming' the model, right?"

94.     To which Mr. Parker replied: "I do.  Thanks Chet."  Ex. 17 (2009-07-24 email RE DeNovo Model).

95.     The above exchange illustrates how DaVita management understands that its employees game the models, and only objects when the manipulation works to DaVita's disadvantage.  Mr. Parker was inquiring about use of financial models to evaluate whether DaVita should build a new center (termed a "De Novo").  He was concerned because DaVita's regional directors receive extra compensation for new centers and therefore manipulate the models to make a De Novo appear more financially viable.  In other words, as illustrated by the email, DaVita executives know full well that gaming of the financial models occurs.

**B.      DaVita Uses Non-Competition Agreements To Secure Referrals from Physicians To Whom it Has Paid Kickbacks**

96.     In addition to the inflated payments for center acquisitions and below-market

sweetheart deals for sales, DaVita fraudulently ensures that it will receive the referrals from a physician or group to whom it pays kickbacks by requiring them to execute Medical Director Agreements with non-competition provisions.  Through these contracts, DaVita ensures that the physicians will have no ownership interest in any other dialysis center during their tenure as Medical Director at the DaVita center (usually ten years) – and thus will have no financial incentive to send referrals to any other center.

97.     The critical role these non-competition agreements, and their corresponding implicit guarantee of referrals, play in these transactions is illustrated in a July 25, 2008 email exchange between John Walcher, a DaVita Transaction Director, and Michael Staffieri, the Division Vice President, concerning a deal in the Klamath Falls region of Oregon.  DaVita was buying a dialysis center, Sky Lakes Dialysis, and contemplating hiring as medical directors a group of physicians (Renal Care Consultants or "RCC") who, themselves, owned a separate group of dialysis centers.  The RCC physicians were also responsible for a substantial portion of the referrals to the Sky Lakes center.  Mr. Walcher asked Mr. Staffieri:

"Do you want us to proceed with the acquisition in the event RCC sells their centers to FMC [a DaVita competitor] or some other competitor (whether or not RCC is the Sky Lakes medical director)?

"Our concern is being able to close the Sky Lakes acquisition prior to knowing if RCC will sell to us or FMC.  If you two are comfortable closing the Sky Lakes acquisition as long as RCC is the medical director (and is bound by a reasonable non-compete clause), we will push both Sky Lakes and RCC for a quick resolution to this issue.  If we aren't willing to close Sky Lakes until we know whether or not we're buying RCC's centers, we'll need to delay the Sky

Lakes close (thereby potentially putting the deal in jeopardy) until we have

closure on RCC."

98.     Mr. Staffieri responded:

"I am less concerned about whether or not RCC sells its centers to us or

not.  The important thing is that they sign a 10-year MDA with a 25 mile non-

compete around Klamath Falls.  If they will not sign that agreement, then we are

wasting our time and money.  <u>All the patients in Klamath Falls are theirs.</u>

<u>Without the agreement and non-compete, they will simply build a [a center of</u>

<u>their own] and move their referrals to the center and we will be left with nothing</u>."

"Call me if you want to discuss.  I will not approve closing without RCC

signing an MDA."

Ex. 18 (2008-07-25 email RE Klamath Falls MDA Question) (emphasis added).

99.     In order to maximize the amount it would pay the RCC physician group for its

dialysis centers, DaVita assumed that half of the patient revenue from the Sky Lakes center

would be diverted to the RCC-owned centers, on the assumption that Sky Lakes would lose those

referrals if DaVita did not buy the RCC centers.  Ex. 19 (2009-05-05 email RE RCC sensitivity).

Of course, no such assumption of diminished revenue was used when calculating the price

DaVita paid a local hospital for the Sky Lakes center itself.

100.    DaVita also pays more for dialysis centers depending on the number of physicians

who would be bound to refer to DaVita through non-competition agreements or otherwise.  For

example, in an October 8, 2008 email from David Finn, Deal Depot Vice President, to Mr.

Walcher, the transaction director for the Klamath Falls deal, Mr. Finn wrote: "assuming we get

joiners from all docs in the med dir group (4?), you can go up to 3.5mm." Ex. 20 (2008-10-08 email RE Klamath Falls).

C.   **Examples Illustrating the Effect of DaVita's Various Fraudulent Manipulations of its Valuation Models**

1.   **Rocky Mountain Dialysis / Mountain West Dialysis Transaction**

101.   A prime example of DaVita's use of illegal kickbacks masked as joint ventures and other transactions to respond to a "competitive hot spot" – i.e., the risk of loss of business to a competitor – occurred in Denver, Colorado in June 2008.  This type of transaction, in which DaVita bought and sold centers in the same geographic market at the same time, is particularly revealing of DaVita's goal to funnel cash and other illegal remuneration to referring physicians.

102.   In the Spring of 2008, a DaVita-aligned physician practice, Western Nephrology, terminated its relationship with DaVita and moved forward with plans to build (and send its patients to) new dialysis centers in a joint venture with a different dialysis company.  Prior to that time, Western Nephrology was responsible for a substantial portion of the referrals to DaVita's dialysis centers on the west side of Denver.

103.   In order to replace that business and maintain its market share, DaVita approached Denver Nephrology ("DN"), the physician practice that provided most of the referrals to DaVita's dialysis centers on the east side of Denver, to see if they would be interested in expanding to the west side of Denver.  At that time, DaVita and DN were co-owners of Rocky Mountain Dialysis, a joint venture which ran three dialysis centers on Denver's east side.

104.   At the time, DN did not have any offices on the west side of Denver.  DN was interested in DaVita's proposal, but did not want to commit the capital to open the necessary new offices across town.  In order to finance DN's expansion, DaVita proposed a transaction that would give DN both an immediate cash infusion, and an ongoing share of the profits from

bought out DN's shares (49%) of Rocky Mountain Dialysis for over $19 million and (2) sold DN

a 49% interest in joint ventures containing eight of DaVita's dialysis programs on the west side

of Denver, for $3.8 million.  Ex. 6 (Closed Deal Activity spreadsheet); Ex. 7 (DaVita M&A

Transactions v8 spreadsheet); Ex. 21 (Membership Interest Purchase and Sale Agreement); Ex.

22 (Contribution Agreement); Ex. 23 (Intercompany Distribution Agreement); Ex. 24 (Stock

Purchase Agreement); Ex. 25 (Asset Purchase Agreement).

105.    Although the centers were all in the same city/geographic region, the prices paid

for the two types of transactions (purchase versus sale) were starkly different.  On average,

DaVita valued the centers it bought at approximately $13 million each, but only valued the

centers it sold at approximately $635,000 each.  Ex. 9 (Denver Transaction Summary).  These

price differentials reflect the impact of HIPPER Compression and other ad hoc manipulations

DaVita used to fit the transaction into its Buy High / Sell Low kickback strategy.

106.    When DaVita first began analyzing this potential deal, Transaction Director

Kenneth Leidner approached Relator and asked him to produce an analysis of the projected value

of the three centers in the Rocky Mountain joint venture using DaVita's standard assumptions.

Relator's preliminary model projected that the three centers were collectively worth $21.1

million.

107.    To reach this figure, Transaction Director Ken Leidner directed Relator not to use

HIPPER compression.  Accordingly, the model was gamed as follows:  the effect of HIPPER

compression was offset arbitrarily by increasing the expected revenue per treatment from $299 to

$315; operating costs were arbitrarily reduced by decreasing the expected bad debt from $14.29

per treatment to only $7.88, and expected G&A costs from $23.04 to $13.50.

108.     Mr. Leidner then told Relator that Tom Usilton, Senior Vice President of Corporate Development, requested a table showing the projected value for the centers that would result if the model was further manipulated to reflect various EBITDA multiples and growth rates.

109.     Relator later learned that DaVita was moving forward, but the Rocky Mountain joint venture had been valued at some $39.5 million.  To reach this value, Deal Depot management "gamed" the model even further, increasing the "terminal value" from $25 million to $29 million, and slashing the required IRR from 16.7% to 3.5%.  Ex. 8 (Rocky Mountain 2008-04-21c 39.497M.xls //Summary worksheet)

110.     Near the time the transaction was set to close, Deal Depot's management sought a third-party opinion to reflect that the approximately $39 million price for these three centers was fair market value.  This was unusual because typically Deal Depot only sought fair-market-value opinions on the value of centers it was selling.  Rather than use Deal Depot's usual valuation firm, they gave the task to a new firm.  Relator was told that this new firm's analysis did not support DaVita's desired $39 million price.  Instead, even using the doctored financial data provided by DaVita, this new firm reported that fair market value for the three centers was no more than $30 million.  When the valuation firm orally reported its findings, DaVita ordered the company not to produce a written report of its findings, and consummated the deal based on its inflated $39 million price.  DaVita managers told Relator that DaVita paid the new valuation firm thousands of dollars for its unwritten services that DaVita ended up not using in the deal.

111.     Despite the gaming employed to inflate the purchase price of centers bought from referring physicians, no such favorable manipulations were made when valuing the eight centers DaVita sold to DN.  Instead, projected revenues were improperly depressed using HIPPER

compression.  As a result, the prices charged to the physicians for these centers were barely at the value of the hard assets of the centers.  Ex. 9 (Denver Transaction Summary)

<strong>2</strong>.      <strong><u>St. Cloud, Florida Transaction</u></strong>

112.    Another example of a transaction where DaVita both bought and sold shares of dialysis centers in the same general market, to the same physician, at the same time is the St. Cloud transaction in Florida in August 2007.  In this transaction, DaVita: (1) bought a 60% interest in Nephrology Consultants Dialysis Center from its physician-owners; (2) sold a 40% interest in three existing DaVita dialysis centers in the same area to the same physician group; and (3) created a joint-venture with that physician group, which included ownership of the four existing dialysis centers, and one De Novo center.  Ex. 26 (St Cloud Transaction Summary)

113.    DaVita executed this transaction because, according to the Executive Summary of the deal analysis, the deal would: "Further align[] our interests with Internal Medicine Specialists (IMS), a leading physician group in Orlando with medical directorships . . . at 10 Orlando-area DaVita dialysis centers."  In other words, the center was owned by an influential physician who (along with his medical group) was responsible for a substantial portion of the referrals to 10 existing DaVita dialysis centers.  Ex. 26 (St Cloud Transaction Summary).

114.    Relator has financial performance data for the center DaVita bought and one of the three centers it sold.  According to this data, the center DaVita sold had comparable profits – earning $1.16 million versus $1.05 million earned by the center DaVita bought.  The center DaVita sold was also busier – serving 154 patients versus 126 patients served by the bought center.  Ex. 26 (St Cloud Transaction Summary).

115.    Notwithstanding the comparable features of the two centers, DaVita attributed a much higher value to the center it bought.  DaVita valued the center it bought at $5,975,000, but

only valued the three centers it sold at $3,075,000 total ($1,025,000 each).  Ex. 26 (St Cloud

Transaction Summary).

116.    To justify the inflated price for the center it bought, DaVita gamed the model by

simply increasing the expected revenue per treatment from $246 to $268.  DaVita also used

artificially low figures for bad debt ($4.91 per treatment versus the average in that region of

$9.20) and G&A expenses ($13.50 per treatment versus the average in that region of $22.62).

Ex. 27 (StCloud_Model_MSP_080107_final.xls // 'Consolidated P&L' worksheet).

117.    Even after DaVita gamed the profitability of the financial model for the center it

bought, that center was still only slightly more profitable on a per treatment basis than one of the

centers it sold – still far from justifying the highly inflated purchase price.

### 3.    Columbus, Ohio Transaction

118.    Two transactions in Columbus, Ohio provide another example of the different

prices DaVita assigned to similar dialysis centers in the same market.  DaVita Financial Analyst

Chris Pannell told Relator that, shortly before being acquired by DaVita in 2004, Gambro

(DaVita's predecessor company) bought a group of dialysis centers from a physician group for

$18 million.  Several years later, DaVita sold a 40% share in the same centers back to the same

physician group, but this time based on a 100% valuation of only approximately $6 million, even

though the financial situation of the centers and of the market had not changed in the intervening

years.  Ex. 6 (Closed Deal Activity Spreadsheet ).

### 4.    Kidney Center, Inc. (aka Kant Tucker) Transaction

119.    DaVita's planned purchase of a large group of dialysis centers in Simi Valley,

California provides a prime example of the extreme manipulations DaVita used to ensure that it

would win access to physicians with a substantial referral base.  At the time Relator left DaVita,

the company was planning to purchase a number of dialysis centers from Kidney Center, Inc. This transaction is alternately known as the "Kant Tucker" transaction, named after the founder, CEO and president of KCI, Dr. Kant Tucker.

120.    The deal originally involved the purchase of 13 dialysis centers, where 1,145 patients received treatment.  DaVita Senior Vice President Tom Usilton was in charge of the deal, and pushed aggressively to pay as much as possible to win the business because a deal with that many patients would have satisfied a large portion of Deal Depot's annual quota.  DaVita's management expected Deal Depot to acquire centers whose physicians would refer at least 1,500 patients to DaVita centers in 2009.

121.    Mr. Usilton originally proposed purchasing all thirteen centers for $81 million, even though the deal would only produce an IRR of 2.7% at that price.  Because this IRR is less than DaVita's cost of capital, DaVita would have been required (under Generally Accepted Accounting Principles) to record a loss as soon as the deal closed.  Such a result was unacceptable, so Mr. Usilton began a process of manipulating the model to increase the reported IRR.

122.    As of the time Relator left the company, Mr. Usilton was pushing to pay $48.1 million for part of KCI.  This price was more than double the amount supported by DaVita's financial models – even after the standard gaming was done to increase projected revenue and decrease costs.  With standard gaming, the projected value was only $21.8 million.

123.    Mr. Usilton and Mr. Finn manipulated the model to justify the $48 million figure. To do this, Mr. Usilton and Mr. Finn first directed Relator to remove HIPPER compression, which increased the projected value to $28.8 million.  Next, they decreased the expected cost of capital from 12% to 9%, which increased the projected value to $41.2 million.  Then, they

further manipulated several of the values commonly used to game the model (increasing the expected revenue per transaction by $29, and reducing the expected G&A expenses from $13.50 to $9), which increased the projected value to $46.8 million.  Two additional, smaller adjustments brought the final value to the desired $48.1 million.  Ex. 28 (KCI Waterfall2.xls).

    **5**.    **Other Transactions**

124.    Since 2002, DaVita has bought shares of dialysis centers, sold shares of dialysis centers or built De Novo centers for purposes of creating a joint venture with physicians in: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin.

125.    Details of each of these transactions are contained in the table attached as Exhibit 6 to this Complaint.  Ex. 6 (Closed Deal Activity Spreadsheet  // worksheets 2002-2009).

126.    Based on Relator's knowledge of DaVita's business practices as set forth herein, especially the use of HIPPER compression and the standard practice of "gaming" models using ad hoc adjustments to model assumptions, Relator alleges, on information and belief, that many transactions where DaVita sold referring physicians all or part of an existing DaVita center, bought all or part of a center from referring physicians, or entered into a joint venture involving existing or new dialysis centers violated the AKS statute.

127.    In the time since these kickbacks were paid, these centers submitted many thousands of claims for payment for dialysis services to Medicare and other Government-funded health care programs.  For the centers in suspect transactions in 2008 alone, the total amount

DaVita billed to Medicare and Medicaid was at least $49M.  Ex. 29 (Centers of Interest2.xls).

DaVita's systematic divestitures at artificially low prices potentially affected over 40 centers in

16 states in the past three years alone (since it instituted the HIPPER compression policy).  Ex. 7

(DaVita M&A Transactions v8.xls).  Extrapolated from the 2008 Medicare and Medicaid

billings, these 40 centers billed Medicare and Medicaid well over $100M for dialysis and related

products and services in the past three years.

128.    All claims for services submitted by DaVita or any of the physicians who

received kickbacks are false claims within the meaning of the federal and Plaintiff State False

Claims Acts.

**D.    DaVita's Payments for Referrals Are Not Sanctioned by any AKS Safe Harbor**

129.    DaVita's "Buy High / Sell Low" strategy gives the physicians involved an

immediate kickback, either the inflated sale price of the centers sold, or ownership of a share of

existing centers at a below market value price.  By forming joint ventures, DaVita provides those

referring physicians an ongoing stream of kickbacks in the form of distribution of profits from

the centers.

130.    As set forth above, HHS OIG has recognized that such revenue streams pose a

substantial risk of violating the AKS, because the physician is in a position to earn profits based

on the volume and value of referrals he or she sends to the joint venture.  Accordingly, HHS OIG

has created a safe harbor, which allows physician ownership of such joint ventures only if the

transaction meets the eight requirements of the safe harbor.  See 42 C.F.R. § 1001.952(a)(2).

131.    The DaVita joint ventures do not qualify for protection under that safe harbor, for

several reasons.  First, for joint ventures which include dialysis centers formerly owned solely by

either DaVita or its physician partners, because of DaVita's fraudulent manipulation of the prices

it paid and charged for those centers, the relative ownership shares of DaVita and the physicians are not proportional to their respective capital contributions.  When Davita sold a portion of its interest in a center at below market price, or purchased a portion at above market price, the physicians ended up owning a higher percentage of the true value of the center than their relative capital contribution.  Thus, the profit distribution to the physicians are not "directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor."  See 42 CFR § 1001.952(a)(2)(viii).

132.    Second, in many cases, physicians who refer business to the joint venture own more than 40% of the entity, in violation of 42 CFR § 1001.952(a)(2)(i).  Although DaVita's official policy provides that, as a general rule, "DaVita should attempt to own at least 60% and have controlling rights for [any] JV," this rule may be, and regularly is, overridden.  Examples of such transactions include the following:

- In the Rocky Mountain / Mountain West transaction, described in greater detail above, the Denver Nephrology physician group initially owned 49% of DaVita's Rocky Mountain Dialysis joint venture, and later owned 49% of DaVita's Mountain West Dialysis joint venture.  Exs. 6, 9, 21.  In February 2009, DaVita sold a 46% share in a dialysis center joint venture to the Florida Medical Clinic physician group in Florida in the "Zephyrhills" transaction.  Ex. 7 (DaVita M&A Transactions v8.xls).

- In April 2009, DaVita sold a 49% share in a dialysis center joint venture in California to Capital Nephrology Medical Group in the "West Elk Grove" transaction.  Ex. 7 (DaVita M&A Transactions v8.xls).

133.    Third, DaVita knows, and often expects, that physicians who own part of a

dialysis center joint venture will likely be responsible for more than 40% of the centers' gross revenue.  Cf. 42 CFR § 1001.952(a)(2)(vi)  As DaVita explained in its most recent SEC annual report: "As is typical in the dialysis industry, one or a few physicians, including the center's medical director, usually account for all or a significant portion of a dialysis center's patient referral base.  Our medical directors provide a substantial portion of our patient referrals."  Ex. 1 at 9.  DaVita's joint venture partners were nearly always the medical directors and physicians who referred a high volume of patients to the centers.

134.   Finally, physicians are generally only offered the opportunity to join in a joint venture with DaVita if they have referred patients to DaVita centers in the past, or are in a position to do so in the future.  Thus, the terms under which the physicians are allowed to invest are "related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity." Cf. 42 CFR § 1001.952(a)(2)(iii).

135.   A transaction that fails to comply with one of the safe harbors does not necessarily violate the AKS.  Instead, the facts and circumstances surrounding such transactions must be analyzed to determine whether the physicians were paid, in whole or in part, in order to influence where the physicians referred their patients.  As discussed above, DaVita's practices clearly evidence payments in exchange for referrals.

**E.    Purchases of Non-Competition Agreements**

136.   Another DaVita practice which violates the AKS is the stand-alone purchase of non-competition agreements.  As set forth above, DaVita views non-competition agreements as an essential part of any transaction where it buys dialysis centers from or sells a share of centers to referring physicians.  DaVita uses these agreements to functionally ensure that the physician

will refer his or her patients to DaVita centers by eliminating the physician's opportunity to have an ownership interest in, and thus a financial incentive to refer patients to, another center.

137.    Relator has been told by DaVita personnel that in some cases, DaVita has paid a physician to enter into a stand-alone non-competition agreement – i.e., a contract unrelated to the purchase or sale of shares in any dialysis center or joint venture.  This was done in situations where DaVita was concerned that a physician who referred a substantial volume of patients might decide to build or buy a dialysis center, either independently or in connection with a competing dialysis company.  Usually, in such situations, DaVita would sell the physician a share of DaVita's existing centers at a bargain price.  However, in some limited circumstances DaVita instead simply paid the physician to sign a stand-alone non-competition agreement, agreeing not to build a competing center.

138.    Through this practice, DaVita effectively paid the physician to continue referring patients to the DaVita center.  As such, this payment violates the AKS.  Any claims submitted for services rendered to the physician's patients are false claims within the meaning of the federal and Plaintiff State False Claims Act.

### Count I
### False Claims Act
### 31 U.S.C. §§3729(a)(1)(A)-(C)

139.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

140.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

141.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and

services to the United States Government for payment or approval.

142.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to a false or fraudulent claims for dialysis services and dialysis-related items and services.

143.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to violate subsections a(1)(A) and a(1)(B) of 31 U.S.C. §3729.

144.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false claims were presented by numerous separate entities, across the United States.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

145.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

146.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

147.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### Count II
### California False Claims Act
### Cal Govt Code §12651(a)(1)-(3)

148.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

149.     This is a claim for treble damages and penalties under the California False Claims Act.

150.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

151.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

152.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

153.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

154.     The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

155.     By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

156.     Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Count III
### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(a)-(c)

157.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

158.     This is a claim for treble damages and penalties under the Florida False Claims Act.

159.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

160.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

161.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

162.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

163.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

164.     By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

165.     Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count IV**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §49-4-168.1(1)-(3)**

166.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

167.     This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

168.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

169.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

170.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related

items and services allowed or paid by the State.

171.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

172.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

173.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

174.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count V**
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. §175/3(a)(1)-(3)**

175.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

176.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward and Protection Act.

177.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

178.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the

State to approve and pay such false and fraudulent claims.

179.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

180.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

181.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct..

182.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

183.    Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.


**Count VI**
**Indiana False Claims and Whistleblower Protection Act**
**Ind. Code Ann. §5-11-5.5-2(b)(1)-(2), (7)**

184.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

185.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

186.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

187.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

188.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

189.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

190.     The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

191.     By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

192.     Additionally, the Indiana State Government is entitled to the maximum penalty of $5,000 for each and every violation alleged herein.

**Count VII**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. §437 et seq.**

193.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

194.     This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

195.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

196.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

197.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

198.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

199.     The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

200.     By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

201.     Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count VIII**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws. §400.601 et seq.**

202.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

203.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

204.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

205.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

206.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they

entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

207.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

208.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

209.     By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

210.     Additionally, the Michigan State Government is entitled to the maximum civil penalties for each and every violation alleged herein.

**Count IX**
**Nevada False Claims Act**
**Nev. Rev. Stat. Ann. §357.040(1)(a)-(c)**

211.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

212.     This is a claim for treble damages and penalties under the Nevada False Claims Act.

213.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

214.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

215.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

216.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

217.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

218.    By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

219.    Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count X
## New York False Claims Act
## N.Y. State Fin. §189(1)(a)-(c)

220.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

221.    This is a claim for treble damages and penalties under the New York False Claims Act.

222.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

223.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

224.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

225.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

226.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

227.    By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

228.     Additionally, the New York State Government is entitled the maximum civil penalty of $12,000 for each and every violation alleged herein.

### Count XI
### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63 §5053.1(B)(1)-(3)

229.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

230.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

231.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

232.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

233.     By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

234.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

235.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

236.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

237.    Additionally, the Oklahoma State Government is entitled to the maximum civil penalty of $10,000 for each and every violation alleged herein.

### Count XII
### Tennessee False Claims Act and Tennessee Medicaid False Claims Act
### Tenn. Code Ann. §§4-18-103(a)(1)-(3) and 71-5-182(a)(1)(A)-(C)

238.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

239.    This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

240.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to Tennessee and the Tennessee Medicaid Program for payment or approval.

241.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce Tennessee and the Tennessee Medicaid Program to approve and pay such false and fraudulent claims.

242.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the

physicians to whom they sold and from whom they bought dialysis centers, and with whom they

entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related

items and services allowed or paid by Tennessee and the Tennessee Medicaid Program.

243.    Relator cannot at this time identify all of the false claims for payment that were

caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if

not thousands, of separate entities across the State.  Relator has no control over or dealings with

such entities and has no access to the records in their possession.

244.    The Tennessee State Government and the Tennessee Medicaid Program, unaware

of the falsity of the records, statements and claims made, used, presented or caused to be made,

used or presented by Defendants, paid and continue to pay the claims that would not be paid but

for Defendants' unlawful conduct.

245.    By reason of Defendants' acts, Tennessee and the Tennessee Medicaid Program

have been damaged, and continue to be damaged, in substantial amount to be determined at trial.

246.    Additionally, Tennessee and the Tennessee Medicaid Program are entitled to the

maximum penalty allowed by Tennessee law for each and every violation alleged herein.

### Count XIII
### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §36.002

247.    Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 138 above as though fully set forth herein.

248.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud

Prevention Law.

249.    By virtue of the acts described above, Defendants knowingly presented or caused

to be presented, false or fraudulent claims for dialysis services and dialysis-related items and

services to the State for payment or approval.

250.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

251.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

252.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

253.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

254.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

255.    Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**Count XIV**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §8.01-216.3(a)(1)-(3)**

256.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

257.  This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

258.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

259.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

260.  By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

261.  Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

262.  The Government of the Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

58

Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

263.    By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

264.    Additionally, the Government of the Commonwealth of Virginia is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

### Count XV
### Wisconsin False Claims for Medical Assistance Act
### Wis. Stat §20.931(2)(a)-(c)

265.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 138 above as though fully set forth herein.

266.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

267.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for dialysis services and dialysis-related items and services to the State for payment or approval.

268.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State to approve and pay such false and fraudulent claims.

269.    By virtue of the acts described above, Defendants have conspired among themselves and with the other persons and entities identified in this Complaint, especially the physicians to whom they sold and from whom they bought dialysis centers, and with whom they entered joint ventures, to get false or fraudulent claims for dialysis services and dialysis-related items and services allowed or paid by the State.

270.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by hundreds, if not thousands, of separate entities across the State.  Relator has no control over or dealings with such entities and has no access to the records in their possession.

271.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

272.    By reason of Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

273.    Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### Prayer

WHEREFORE, Relator prays for judgment against Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. §3729 et seq., and the counterpart provisions of the Plaintiff State statutes set forth above;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §12651(a);

4.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2);

5.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Ga. Code Ann. §49-4-168.1;

6.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

7.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of at least $5,000 for each violation of Ind. Code Ann. §5-11-5.5-2(b);

8.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et seq.;

9.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus the maximum civil penalties allowed for each violation of Mich. Comp. Laws. §400.601 et seq.;

10.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

11.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions,  plus a civil penalty of $12,000 for each violation of N.Y. State Fin. §189(1);

12.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions,  plus a civil penalty of $10,000 for each violation of Okla. Stat. tit. 63 §5053.1(B);

13.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus the maximum civil penalty allowable for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

14.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of  Tex. Hum. Res. Code Ann. §36.002;

15.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Va. Code Ann. §8.01-216.3(a);

16.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Wis. Stat §20.931(2);

17.     That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the State statutes set forth above;

18.     That Relator be awarded all costs of this action, including attorneys' fees and

expenses; and

19.     That Relator recover such other relief as the Court deems just and proper.

**Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.


Dated:      September 11, 2009              Respectfully submitted,

                                            CROSS & BENNETT LLC

                                            By _____
                                                Keith Cross (CO State Bar No. 8934)
                                                KCross@CrossBennett.com
                                                Cross & Bennett LLC
                                                108 E. St. Vrain, Suite #20
                                                Colorado Springs, CO  80903
                                                Tel.: (719) 633-1359
                                                Fax: (719) 633-5788

                                                PHILLIPS & COHEN LLP
                                                Eric R. Havian
                                                erh@pcsf.com
                                                Claire M. Sylvia
                                                cms@pcsf.com
                                                Jessica T. Moore
                                                jtm@pcsf.com
                                                PHILLIPS & COHEN LLP
                                                131 Steuart St., Suite 501
                                                San Francisco, CA 94105
                                                Tel: (415) 836-9000
                                                Fax: (415) 836-9001

                                            Attorneys for Qui Tam Plaintiff David Barbetta

Certificate of Service

I am a citizen of the United States, over the age of 18 and not a party to this action.  My business address is 131 Steuart St., Suite 501, San Francisco, CA 94105.

On September 11, 2009, I served the foregoing documents described as:

COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS

WRITTEN DISCLOSURE STATEMENT

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as set forth below:

David M. Gaouette, Esq.
United States Attorney for the District of
   Colorado
1225 17th Street, Suite 700
Denver, CO 80202

The Honorable Eric H. Holder Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Edmund G. Brown Jr., Esq.
Attorney General of the State of California
Department of Justice
1300 I Street, 11th Floor
Sacramento, CA 95814

Bill McCollum, Esq.
Attorney General of the State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Alex Sink
Chief Financial Officer
Florida Department of Financial Services
Division of Legal Services
200 East Gaines Street
Tallahassee, FL 32399-0333

Thurbert E. Baker, Esq.
Office of the Attorney General for the State
   of Georgia
40 Capitol Square, SW
Atlanta, GA 30334

Lisa Madigan, Esq.
Attorney General for the State of Illinois
Attention:  Patrick Keenan, Esq.
Bureau Chief, Illinois MFCU
100 W. Randolph, 12th Floor
Chicago, IL 60601

Greg Zoeller, Esq.
Attorney General of the State of Indiana
Indiana Government Center
302 W. Washington St.
Indianapolis, IN 46204

David Thomas, Esq.
Inspector General
150 W. Market St., Room 414
Indianapolis, IN 46204

James D. Caldwell, Esq.
Attorney General of the State of Louisiana
1885 North 3rd St. 6th Floor
Baton Rouge, LA 70802

Alan Levine, MD, Secretary
Louisiana Department of Health and Hospitals
1201 Capitol Access Road
Baton Rouge, Louisiana 70821-0629

Mike Cox, Esq.
Attorney General State of Michigan
G. Mennen Williams Building, 7th Floor
525 W. Ottawa St.
Box 30212
Lansing, MI  48909

Catherine Cortez Masto, Esq.
Attorney General of the State of Nevada
c/o Medicaid Fraud Control Unit
100 N. Carson Street
Carson City, NV 89701

Andrew M. Cuomo, Esq.
Attorney General State of New York
120 Broadway, 13th Floor
New York, New York 10271
Attention: SAAG Kathy Marks

W. A. Drew Edmondson, Esq.
Attorney General of the State of Oklahoma
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK 73105

Robert E. Cooper, Jr., Esq.
Attorney General of the State of Tennessee
Office of the Attorney General and Reporter
Cordell Hull Building, Ground Floor
425 5th Ave. N
Nashville, TN 37243

Greg Abbott, Esq.
Attorney General of the State of Texas
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

Bob McDonnell, Esq.
Attorney General of the State of Virginia
Office of the Attorney General
900 East Main St.
Richmond, VA 23219

J.B. Van Hollen, Esq.
Attorney General of the State of Wisconsin
State Capitol, Suite 114 E.
P.O. Box 7857
Madison, WI 53707-7857

I caused such envelope(s) to be placed in the United States mail, postage fully prepaid, in accordance with the standard business practices of this office, in the city of San Francisco, California.  I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 11, 2009, in San Francisco, California.

Sherie McLean